William McCALPINE,
Plaintiff–Appellee,

v.

John FOERTSCH and Tom Revane,
Defendants–Appellants.

No. 87–1664.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 3, 1988.
Decided March 6, 1989.

Valerie J. Peiler, Asst. Atty. Gen., Chicago, Ill., for defendants-appellants.

Walter D. Braud, Braud, Warner, Ltd., Rock Island, Ill., for plaintiff-appellee.

Before POSNER and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

Defendants-appellants Tom Revane and John Foertsch appeal from the jury's award of compensatory damages in favor of plaintiff-appellee William McCalpine in a § 1981 suit for intentional discrimination based on race. At the conclusion of defendants' case, the court denied Foertsch and Revane's motion for a directed verdict. The jury returned a verdict against defendants Foertsch and Revane and awarded plaintiff compensatory damages for lost wages and for mental anguish. The defendants moved for judgment notwithstanding the verdict, which the district court denied. Appellants raise two issues on appeal. First, they argue that there is no substantial evidence in the record to support the jury's finding of intentional racial discrimination. Second, they challenge as excessive the jury's award of compensatory damages for lost wages and mental anguish. Because we agree with the appellants that there is no substantial evidence in the record to support the jury's verdict, we reverse and do not reach the issue of whether the damages awarded were excessive.

## I.

McCalpine, a black man, was employed as a Management Systems Specialist in Procedures with the Illinois Department of Employment Security ("Department"). In 1985, the Department suffered a severe reduction in its federal funding. As a result of the loss of funding, the Department was forced to reduce the number of its employees. Seventeen employees in McCalpine's division, including McCalpine, lost their jobs as a result of the 1985 reduction.

Prior to February 1985, the Department was organized into four bureaus. Dianna Durham–McCloud, a black woman, was in charge of the Program and Planning bureau which was composed of five divisions. One of these divisions was Procedures and Training, in which McCalpine worked. Do-lores Elliott, a black woman, was a division manager working directly under McCloud within the Program and Planning Bureau. Defendant John Foertsch, a submanager in the Procedures division, was McCalpine's supervisor. Defendant Revane, an executive in the Financial Management Services bureau, had previously served as Foertsch's supervisor.

At the same time as the Procedures' staff was being reduced, the bureau of Program and Planning was also undergoing reorganization. Dolores Elliott was responsible, along with James Boitnott, Dwan Darden, and Rhoda Muchmore, for creating the mission and function statements for the Department's bureaus under the reorganization. In that role, Elliott prepared job descriptions which were then submitted to the Illinois Department of Personnel ("Personnel").[1] Personnel classified the new job descriptions and determined whether each position was a new position or could be "traced" to an existing one. "Trace" means that fifty percent or more of the existing position was contained within the rewritten job description. If the position had "trace," the employee holding that position had the right to remain in it under the rewritten job description. If there was no "trace" in the rewritten job description, the position was posted and employees were required to apply for it.

Personnel rated and graded the employees who applied for the posted positions. A grade of "A" meant that an employee met the state qualifications for the position and was entitled to be considered for the position for which he or she was rated. Since many employees received "A" grades, Elliott and her staff of Muchmore, Boitnott, and Darden developed a screening criteria to match training and experience with the qualifications needed for available positions. The senior management team of William Grant, Barbara Despenza, and McCloud, all of whom are black, and Robert Frank, who is white, approved the screening criteria. If an individual's appli-

---

**1.** The Department of Personnel, a separate agency of the State of Illinois, is now known as Central Management Services. However, for purposes of this opinion, it will be referred to as "Personnel."

cation passed the screening criteria, that individual was assigned to be interviewed for an available position.

McCalpine was employed by the Department for thirteen years before the 1985 reduction in force. During his tenure with the Department, his supervisors rated him as "highly satisfactory" or better. McCalpine's supervisors promoted him through a series of positions which entailed operating and programming computer systems that the Department used. In 1979, McCalpine was promoted into the Management Information Systems division ("MIS"), which handled the data processing for the Department. While in MIS, Paul Terrault was McCalpine's immediate supervisor and Robert Bludgen was the deputy director of the bureau containing MIS. As a result of a conflict with Terrault, McCalpine took a voluntary demotion in grade in 1980 and transferred into the Procedures division as a Management Systems Specialist. McCalpine testified that Terrault and Bludgen refused to give him proper work assignments and were prejudiced against him because he is black. McCalpine further testified that Bludgen had told him that he considered McCalpine to be the necessary "token black manager." When McCalpine transferred into Procedures, these problems ceased.

One of the positions in the Procedures division involved in the reorganization was McCalpine's position as "Management Systems Specialist." As a result of the reorganization, two positions were created with this title. As with all the other positions in the Department, Elliott and her assistants, Darden, Muchmore, and Boitnott, wrote the job descriptions for these two positions and Personnel assigned them the title of Management Systems Specialist. Personnel determined that neither of the reorganized positions were "traceable" to McCalpine's position because there had been a significant change in duties. Consequently, the two Management Systems Specialist positions were posted as job announcements RA–562H ("H Specialist") and RA–5621 ("I Specialist").

McCalpine, along with a number of other candidates, applied for the Specialist positions. McCalpine received an "A" grade, passed the screening criteria, and was allowed to interview for the two new positions. Because of the similarity in the two Specialist positions, applicants were interviewed for both positions at the same time. McCloud and Elliott selected the individuals who formed the panel assigned to interview the applicants. In forming the panels, McCloud chose one individual from each of three groups: the supervisor of the position; a user of the services; and a technical expert. As the panel for the Specialist position, Elliott chose Foertsch, because he was just appointed as supervisor of that position. Elliott chose Kathleen Fredricks as the user of the Specialist services and then selected Revane because of his familiarity with the technical requirements of the position.

On the day of the interviews, the panel members received the names of the individuals they would be interviewing. The panel members were never given the individuals' actual applications for the Specialist positions. Each member of the panel received a written set of questions, which McCloud and Elliott had prepared, to ask at the interview entitled "Selection Interview." Along with the questions, the panel members received a "Panel Information Sheet" instructing them on how to conduct the interviews. The questions were structured, sometimes through the use of subparts, to allow for two scores corresponding to the positions of H Specialist and I Specialist. The "A" question and/or score pertained to the H Specialist, while the "B" subpart and/or score pertained to the I Specialist. The range of possible scores per question was zero to five points.

The written instructions were quite detailed. They instructed the panel members not to vary the questions and to ask only the questions indicated on the sheet. They further specified that each interview was to last for thirty minutes and to be conducted in exactly the same manner. At the conclusion of the interviews, the panelists were to record the candidate's total score and then to compute an average panel

score for each candidate. The panelists were instructed to base their scores solely on the candidates' responses to the questions, not on their prior experience with the candidates or on the candidates' past job performance evaluations.

The H Specialist was a technical advisor to the Unemployment Insurance division. Specific duties of the H Specialist included: providing technical advice to the Benefit Information System Component of Unemployment Insurance, determining priorities, monitoring results and coordinating implementation in data processing changes to the Benefit Information System, and administering the security system for the computer. The H Specialist required four years of experience in computer-based management information systems.

The I Specialist was designated as the assistant manager for the subdivision. The I position was for a technical advisor to the Field Operations, Central Office Operations, and Revenue divisions. Specific duties of the I position included: determining priorities, monitoring results and coordinating implementation of data processing changes in the automated systems for Job Service, Revenue, Field Operations, and Central Office Operations. As the assistant manager of the subdivision, the I Specialist was required to serve on the Management Advisory Subcommittee and to have four years of experience in computer-based management information systems.

The panel of Foertsch, Revane, and Fredricks interviewed Shelva Hogan, Elaine Lang, McCalpine, Charles Finch, Michael Bisberg, and Robert Haas for both the H and I Specialists. The panel also interviewed Nathan Cohen for the H Specialist only. Hogan, Finch, and McCalpine are black. Prior to the reorganization, McCalpine's job as a Management Systems Specialist was assigned a pay grade of twenty. His position required a fair degree of technical expertise, and he had taken courses in management, statistics, mathematics, and systems analysis. Lang was an Executive

I before the reorganization, and her job was classified as grade sixteen.[2] She had never taken any courses in mathematics, statistics, systems analysis, or computer science. McCalpine testified that he had a cordial relationship with both Revane and Foertsch, and that he occasionally socialized with them and other members of the Department after work. However, plaintiff testified that Revane was friendlier towards whites. Lang had a friendly relationship with Foertsch, and she and her husband had been driving to work with him on a daily basis for six or seven years.

During the interviews, the panel members each asked questions. McCalpine was having trouble hearing during the interview and asked to have a few questions repeated. Because of his hearing difficulty, the panel returned to one of the questions during McCalpine's interview. However, he never asked to have the interview postponed or rescheduled. Each panelist made notes of the individual's answers and then independently scored each individual interviewed.

The panel members scored the interviewees as follows:

| | H Specialist | | I Specialist | |
|---|---|---|---|---|
| Foertsch: | Hogan | 34 | Lang | 37 |
| | Lang | 30 | Finch | 29 |
| | Finch | 24 | Hogan | 21 |
| | McCalpine | 23 | McCalpine | 18 |
| | Haas | 19 | Cohen | 13 |
| | Bisberg | 19 | Bisberg | 11 |
| | | | Haas | 10 |
| Revane: | Hogan | 30 | Lang | 35 |
| | Lang | 27 | Finch | 27 |
| | Finch | 26 | Cohen | 18 |
| | Haas | 21 | Hogan | 16 |
| | Bisberg | 20 | McCalpine | 15 |
| | McCalpine | 15 | Haas | 13 |
| | | | Bisberg | 9 |
| Fredricks: | Hogan | 40 | Lang | 42 |
| | Lang | 36 | Hogan | 34 |
| | Bisberg | 28 | Cohen | 22 |
| | Haas | 24 | Haas | 22 |
| | McCalpine | 20 | Bisberg | 19 |
| | Finch | 16 | Finch | 17 |
| | | | McCalpine | 16 |

2. The higher the number of an employee's pay grade, the higher the employee's salary. Thus, for example, a job with a pay grade of twenty pays more than a job with a pay grade of sixteen.

Based on the cumulative score from all panel members, the individuals were ranked as follows:

| H Specialist | | I Specialist | |
|---|---|---|---|
| Hogan | 3.8 | Lang | 4.2 |
| Lang | 3.4 | Finch | 2.7 |
| Bisberg/Finch | 2.5 | Hogan | 2.6 |
| Haas | 2.4 | Cohen | 1.9 |
| McCalpine | 2.2 | McCalpine | 1.7 |
| | | Haas | 1.6 |
| | | Bisberg | 1.4 |

McCloud decided to weigh these scores as only eighty percent of the selection decision, but she never informed the panel members of her decision. The remaining twenty percent of the decision was divided between the recommendations of McCloud's senior staff, consisting of Elliott, Despenza, Grant, Frank, and herself. McCloud presented the names of the three individuals scoring the highest in each of the Specialist positions to her management team for their comments. None of her management team voiced any concern, surprise, or objections to the scoring or the actual individuals selected.

Based on the panel scores and the approval of the management team, McCloud offered Hogan a Specialist position. However, when McCloud called Hogan to offer her the job, Hogan refused it and told McCloud that she had accepted another position within the Department. As a result of Hogan's refusal, Lang had the highest scores for both the H and I Specialist. Bisberg and Finch had the next highest score for the H Specialist at 2.5. Finch also had the next highest score for the I Specialist at 2.7. If McCloud offered Lang the I Specialist position, McCloud would be required to break the tie between Bisberg and Finch. Lang was also the highest rated applicant for a third position not in Procedures, but she declined it and decided to remain in Procedures. Rather than break the tie for the H Specialist, McCloud offered the H Specialist to Lang and offered Finch the I position. By offering the

Specialist positions to Finch and Lang, rather than Bisberg, McCloud kept two Procedures staff people in the reorganized Procedures division. Personnel reviewed the layoffs for adverse impact on minorities but found no adverse impact. Plaintiff filed a complaint with the Illinois Civil Service Commission, but they responded that it was not within their jurisdiction to investigate his claim of discrimination.

Subsequently, McCalpine filed an action under 42 U.S.C. § 1981[3] against McCloud, Foertsch, Revane and Fredricks, asserting that these defendants denied him equal protection under the law because of his race. McCalpine challenged various facets of the selection process from the decision to post the Management Systems Specialist position as an opening to the scores that he received during the interview. The court dismissed McCloud as a defendant prior to trial. In the middle of defendants' case, the district court granted a directed verdict on behalf of Fredricks.[4] However, the court at this time, and again at the conclusion of defendants' case, denied a motion for a directed verdict in favor of Foertsch and Revane. The jury returned a verdict against defendants Foertsch and Revane and awarded plaintiff $48,000 in lost wages and $48,000 for mental anguish. The defendants moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. The district court denied both motions. Appellants raise two issues on appeal. First, they claim that the district court erred in denying their motion for judgment notwithstanding the verdict. Second, they challenge as excessive the jury's award of compensatory damages for lost wages and mental distress. Because we agree with the appellants that there is no substantial evidence in the record to support the jury's finding of intentional racial discrimination, we reverse and do not

---

**3.** 42 U.S.C. § 1981 provides in full:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons

and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**4.** The plaintiff has not cross-appealed on these issues.

reach the issue of whether the damages awarded were excessive.

## II.

Our standard for reviewing the district court's denial of a motion for judgment notwithstanding the verdict is *de novo. Collins v. Illinois,* 830 F.2d 692, 697 (7th Cir.1987); *Mathewson v. National Automatic Tool Co.,* 807 F.2d 87, 90 (7th Cir. 1986). We examine whether there is substantial evidence to support the jury's verdict. Specifically, we inquire whether the evidence presented, combined with all reasonable inferences that can be drawn from it, is sufficient to support the verdict when viewed in the light most favorable to the party winning it. *La Montagne v. American Convenience Prods., Inc.,* 750 F.2d 1405, 1410 (7th Cir.1984). Any conflicts in the evidence must be resolved in favor of the party winning the verdict. *Id.* We do not judge the credibility of the witnesses. *Freeman v. Franzen,* 695 F.2d 485, 489 (7th Cir.1982), *cert. denied,* 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1400 (1983). While we do not reweigh the evidence as a jury would, we do "weigh the evidence to the extent of determining whether the evidence to support the verdict is *substantial;* a mere scintilla of evidence will not suffice." *La Montagne,* 750 F.2d at 1410.

Although plaintiff brought this suit under 42 U.S.C. § 1981, rather than under Title VII, this court has explained that the same standards govern liability under both statutes. *Ramsey v. American Air Filter Co.,* 772 F.2d 1303, 1307 (7th Cir.1985). In order to establish a claim for racial discrimination under Title VII or section 1981, a plaintiff must show that he was the victim of intentional discrimination. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed. 2d 207 (1981); *Yarbrough v. Tower Oldsmobile, Inc.,* 789 F.2d 508, 510 (7th Cir. 1986). The Supreme Court has stated that in a Title VII case, a plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). If the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* If the defendant carries this burden, the plaintiff may then rebut defendant's reason by proving that the alleged legitimate reason was simply a pretext designed to hide the discrimination. *Id.* at 804, 93 S.Ct. at 1825.

To establish a prima facie case of racial discrimination, the plaintiff must prove (i) that he belongs to a racial minority; (ii) that he applied for an available position; (iii) that, despite his qualifications, he was rejected; and (iv) that the position was filled by another applicant. *See id.* at 802, 93 S.Ct. at 1824.

Plaintiff is a member of a racial minority, he is black. He applied for both Management Systems Specialist positions. Although he received an "A" grade from Personnel and passed the pre-screening criteria, he was not selected for either of the two positions. McCloud offered the H and I positions to Lang and Finch respectively, which they both accepted. Plaintiff thus established all the necessary elements to make out a prima facie case of race discrimination against Foertsch and Revane.

Once plaintiff made out his prima facie case of racial discrimination, the burden shifted to Foertsch and Revane to articulate some legitimate nondiscriminatory reason for why McCalpine was not selected for the available positions. Defendants assert that they were not responsible for determining who was allowed to interview for these positions or for determining whether these new positions were traceable. Defendants also submit that plaintiff's poor responses to the interview questions, not his race, were the direct and sole causes for the low scores that he received.

The evidence shows that Personnel classified the new job descriptions and determined whether they were traceable based on the job descriptions which Elliott, Boitnott, Darden, and Muchmore prepared. The defendants were not responsible in any way for determining that McCalpine was

required to interview for the newly-created positions. The evidence also shows that Personnel rated and graded the employees who applied for the posted positions. Once an employee received an "A" grade from Personnel, he or she was entitled to apply for an available position. There is no support in the record for the fact that Foertsch and Revane had any imput in deciding whether Lang or any other employee was entitled to apply for the openings.

Elliott, along with Boitnott, Muchmore and Darden, developed the screening criteria to determine which employees were eligible to be interviewed for the positions. A biracial management team approved the screening criteria. Foertsch and Revane were not responsible for deciding who was entitled to be interviewed for the positions. The record also reflects that McCloud and Elliott chose the individuals who formed the panel assigned to conduct the interviews. McCloud and Elliott prepared a written set of questions and instructions for the panelists to use during the interviews. According to the instructions, the panel members were not to vary the questions and were to ask only the questions on the sheet. McCloud and Elliott strove to ensure that all interviews were conducted in an identical fashion under identical conditions.

Foertsch, Revane, and Fredricks all testified that their sole responsibility as panel members was in rating the answers to the questions that were given to them. For example, Revane testified that his function was "to evaluate responses to the questions that we asked and to rate them." 2 Tr. 210. The panelists were instructed to base their scores solely on the candidates' responses to the questions, not on the candidates' past job performance evaluations. Revane added, "I was only to take into account the answers to the questions." *Id.* at 255.

There is no evidence of racial discrimination in the defendants' scoring of the candidates. Foertsch scored black applicants in three of the top four slots for both the H Specialist and I Specialist positions. Similarly, Revane placed black applicants in the first and third positions for the H Specialist and black applicants in the second and fourth positions for the I Specialist.

Of all the evidence presented in this case, the defendants' notes that they took as they interviewed and rated the candidates are the most telling. While plaintiff may have been very well qualified for the two positions, he failed to articulate his qualifications and to highlight his work experience during the interview. On question one which asked the candidates to describe their backgrounds, Revane testified that he was "looking for a management related background." *Id.* at 226. He gave McCalpine two zeros for his responses to this question because McCalpine responded that he had performed data processing for thirteen years and performed related functions for five years. Pl. Exhibit 2(B)–5. Fredricks also gave McCalpine low scores for his responses to question one because she wrote that he "didn't go into detail at all." Pl. Exhibit 2(C)–5.

Similarly, on question two which asked the candidates why they applied for the H Specialist and I Specialist positions, Revane testified that he was looking for a background with the Benefit Information System for the H Specialist and a background in Job Service and management skills for the I Specialist. 2 Tr. 226. He gave McCalpine two ones for his responses to these questions because McCalpine's sole reason for applying for the positions was because he was "at the position." Pl. Exhibit 2(B)–5. On question 3(B), which asked the applicants what are some techniques that could affect the policy, decisions, and actions of the Department which you are familiar with to offer advice and consultation on systems for Job Service and Revenue, Fredricks gave McCalpine a one. In her notes, she wrote that the "answer made no sense in combination with [the] question." Pl. Exhibit 2(C)–5. While these are just a sample of the responses that McCalpine gave to the questions, they illustrate that the defendants gave him low scores because his responses justified them. Although McCalpine may have been an excellent worker, his hearing problem during the interview may have prevented

him from properly answering the questions.

On this evidence, the jury had to decide whether the defendants had articulated a legitimate nondiscriminatory reason for rating plaintiff lower than the other applicants. We believe the evidence was sufficient to allow a reasonable jury to conclude that defendants had articulated a nondiscriminatory reason for their actions. The issue then becomes whether McCalpine introduced sufficient evidence to support a finding that the defendants' explanations were either pretextual or not worthy of credence. *Yarbrough,* 789 F.2d at 513. Our standard of review, as noted above, is deferential to a jury's verdict. *Id.* We acknowledge that an employment discrimination case, such as this, involves sensitive and difficult issues of fact concerning discriminatory motives. *Id.* Bearing this in mind, and drawing all reasonable inferences from the evidence in McCalpine's favor, we are still unable to find that he presented sufficient evidence to support the jury's conclusion that the defendants' explanations for his low ratings were not worthy of credence.

At trial, plaintiff argued that as a Management Systems Specialist he was performing many of the functions required in the H and I Specialist positions, and that these positions should not have been posted as openings. However, he never presented any evidence to show that the defendants on appeal played any role in deciding whether his job was traceable. All the evidence adduced at trial showed that Personnel decided whether the jobs were traceable based on the information they received from Elliott and her staff. Plaintiff also contended that Lang should not have been allowed to interview for the new positions because she lacked his technical background and experience in computer science. While we agree that plaintiff proved that he had a better technical background than Lang, he never presented any evidence to show that the defendants were responsible for deciding who was entitled to be interviewed for the positions. All the evidence produced at trial showed that Personnel graded the employees and that Elliott and her staff screened the applicants to determine who would qualify for an interview. There was no evidence linking the defendants to this process in any way. While plaintiff may have been discriminated against, he presented no evidence to show that these two defendants, Foertsch and Revane, had engaged in any discriminatory conduct whatsoever.

McCalpine did present evidence that Terrault and Bludgen discriminated against him because of his race when he worked in their department in 1979 through 1980. These incidents, however, are not the subject of the instant lawsuit. In addition, there is no evidence to show that the defendants shared Terrault's and Bludgen's racial animus toward plaintiff. The facts showed that the panelists rated Hogan, a black woman, as the top candidate for the H position. If she had not accepted a job elsewhere, she would have become the H Specialist. Plaintiff presented no evidence to show that the panelists knew or could have known that Hogan had previously accepted another position.

McCalpine also argued that Foertsch would be the supervisor of the I Specialist and would not want a black person working for him. Even if we accept plaintiff's assertion that Foertsch did not want a black person working for him, the scores that he gave do not show that he intentionally discriminated based on race. Foertsch rated blacks in second, third, and fourth place out of seven candidates. Since Foertsch's vote counted only one-third, he knew there was an excellent chance that a black person would get the I job if the other panelists gave black candidates equally strong ratings. Rather than showing that Foertsch discriminated against blacks, the scores show that he rated them very highly.

McCalpine also offered evidence at trial that Foertsch and Revane were friendlier toward whites than toward blacks. The evidence showed that Foertsch was friendly with Lang, and that he had been carpooling to work with her and her husband for several years. However, plaintiff presented no evidence to show that the defendants intentionally discriminated against him be-

cause he is black. In fact, when plaintiff was asked at trial how the defendants discriminated against him, he replied that "I can't explain why it is discriminatory. I can't explain it." 3 Tr. 337. While one may be able to infer that the defendants rated Lang favorably because they were friendly with her, there is no support in the record for the fact that they intentionally discriminated against plaintiff because he is black. However, we want to take this opportunity to make it clear that we are analyzing only the facts presented in this case. We do not preclude the possibility that, on facts different from those presented in the instant case, a factfinder could find racial discrimination because whites associated more with other whites than with blacks or because whites supported only other white friends for available positions.

### III.

This was not a close case. The jury was instructed that McCalpine must prove the defendants intentionally discriminated against him because of his race. Viewing the evidence presented at trial in the light most favorable to the plaintiff as we must in reviewing a court's decision to deny a motion for judgment notwithstanding the verdict, we find that there was not substantial evidence to support the jury's verdict. Consequently, we hold that the district court improperly denied defendants' motion for judgment notwithstanding the verdict.

We recognize that it is rare for an appellate court to conclude that a district court improperly refused to enter judgment notwithstanding the verdict. *See Ramsey*, 772 F.2d at 1307. We do not reach this decision easily. Nor do we claim to have greater insight than the district court into the state of mind of the people on the selection panel who rejected plaintiff for the H Specialist and I Specialist positions. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 580, 105 S.Ct. 1504, 1515, 84 L.Ed.2d 518 (1985). Our task, as an appellate tribunal, is to determine whether there is substantial evidence to support the jury's

verdict. On the record before us, we cannot say that there is.

Accordingly, the judgment of the district court is

REVERSED.