**Bernard S. HOLZMAN,**
**Plaintiff–Appellee,**
**Cross–Appellant,**

v.

**JAYMAR–RUBY, INC.,**
**Defendant–Appellant,**
**Cross–Appellee.**

Nos. 89–2687, 89–2735.

United States Court of Appeals,
Seventh Circuit.

Argued June 15, 1990.

Decided Oct. 30, 1990.

Thomas R. Meites, Joan H. Burger, Laurie Wardell, Meites, Frackman & Mulder, Chicago, Ill., for plaintiff-appellant.

Gary D. Ashman and Grace A. Newton, Carey M. Stein, Hartmarx Corp., Chicago, Ill., for defendant-appellee.

Before CUMMINGS, EASTERBROOK and MANION, Circuit Judges.

MANION, Circuit Judge.

Bernard Holzman sued Jaymar–Ruby, Inc. (Jaymar) in federal court, alleging unlawful age discrimination under the Age Discrimination in Employment Act (ADEA). A jury found that Jaymar had discriminated against Holzman because of his age and awarded him a total of $185,015 in front and back pay. The jury further found Jaymar's discrimination to be willful. The district court granted Jaymar's motion for judgment notwithstanding the verdict (JNOV) on the issue of willfulness, but denied it as to liability. Jaymar appeals, and Holzman cross-appeals. We affirm the district court's judgment in all respects.

I.

The primary issue Jaymar raises in its appeal is whether the district court erred by denying its JNOV motion on Holzman's ADEA claim. The ADEA provides, in pertinent part, that: "It shall be unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). In reviewing the jury's verdict, the only question we need to resolve is whether the evidence was sufficient for a reasonable jury to conclude that age was a determining factor in Jaymar's decision to fire Holzman. *Brown v. M & M/Mars*, 883 F.2d 505, 507 (7th Cir.1989). In deciding that question, we must view all the evidence in the light most favorable to Holzman, and resolve all evidentiary conflicts and draw all reasonable inferences in Holzman's favor. *Id.; McCalpine v. Foertsch*, 870 F.2d 409, 414 (7th Cir.1989).

Jaymar manufactures men's clothing. Holzman was a salesman for Jaymar whose sales territory covered Northwestern Indiana and part of Illinois. To protect its reputation, Jaymar selects certain retailers to sell its goods. Jaymar has a policy against selling merchandise to retailers who divert that merchandise to unauthorized retailers for sale.[1] The reasons for this policy are to prevent retailers that

---

1. A "diverter" is an approved account that receives goods and then transships to an unapproved retailer, usually a discounter, who sells below the approved customers' prices.

Jaymar believes do not meet its quality standards from selling Jaymar's goods, and to protect its approved retail outlets from being undercut by discounters. Jaymar's executive vice-president Edwin Levitin testified that Jaymar had an "off-stated rule" that it would fire any salesman who sold to a diverter.

According to Jaymar's witnesses, in early 1986 Jaymar detected an unusual buying pattern by Mr. Roberts, a Chicago-area retailer and Holzman account. Jaymar's witnesses testified that retailers usually order goods at least one full season before the retail selling season for those goods. (Such orders are known as advance orders.) Mr. Roberts, however, had not placed an advance order since its initial order in 1983. Instead, Mr. Roberts had been placing large "immediate" or "fill-in" orders, orders retailers normally place during the selling season to replace depleted stock. Jaymar executives testified they thought this buying pattern indicated Mr. Roberts might be diverting goods, and decided to investigate.

The first step Jaymar took in its investigation was to order its shipping department in March 1986 to begin "marking" merchandise that it sent to Mr. Roberts. "Marking" merchandise involved placing a code on the waistband ticket of men's slacks, so that if those slacks turned up in a store other than the authorized retailer Jaymar could determine who diverted those slacks to the unauthorized retailer. Jaymar did not tell Holzman that it suspected Mr. Roberts of diverting, or that it was marking merchandise shipped to Mr. Roberts.

Floyd Wallace, Jaymar's regional sales manager and Holzman's supervisor, testified that on April 1, 1986, he visited the Mr. Roberts store and found no Jaymar goods, despite recent shipments to the store. On April 2, William Grasso, Jaymar's national sales manager, dispatched a memorandum noting that Mr. Roberts was suspected of being a diverter and suggesting that Jaymar needed to make "a clear example" of a salesman to enforce the no-diversion policy: "The message will be clear that we will not condone this action by any man ... regardless of who he is." Jaymar made another shipment to Mr. Roberts soon thereafter. Wallace testified he returned to the store on April 15 and again found no Jaymar merchandise on display.

According to Jaymar, Wallace reported his findings to Levitin. On April 21, Wallace telephoned Holzman and asked him to come to Jaymar's office in Michigan City, Indiana the following morning. At that meeting, Levitin told Holzman that Jaymar suspected Mr. Roberts of diversion. Holzman responded that he had been in the Mr. Roberts store on March 1 and had seen Jaymar merchandise in the store. He also told Levitin that he did not know about any diversion. Grasso told Holzman that he could be fired for selling to a diverter. He also told Holzman, "I'm going to give you the opportunity of retiring because it would be a nice clean break for the company and for you." Holzman refused to retire. Wallace testified he made a third visit to the store later that same day and found no Jaymar merchandise on display. He added that Mr. Roberts employees told him the store did not carry Jaymar goods. That evening, Grasso told Holzman that he would be terminated effective May 31. Holzman was 64 at the time.

Jaymar did not replace Holzman with any new employee. Jim Gole, age 58, took over Holzman's Indiana accounts. Ed Freundlich, age 61, took over Holzman's Illinois accounts. Freundlich soon retired, however, and Jaymar replaced him with a salesman in his mid-thirties.

Jaymar insists that the evidence proves that it fired Holzman because he sold to somebody he should have known was a diverter, not because of his age. There is no real dispute that Mr. Roberts diverted Jaymar merchandise: Mr. Roberts' owner admitted diverting after Jaymar fired Holzman. Even if Jaymar had been mistaken about Mr. Roberts being a diverter, it would not have violated the ADEA if age was not a determining factor in the decision to fire Holzman. See *Brown*, 883 F.2d at 509; *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 560 (7th Cir.1987). But the

facts that Jaymar sincerely believed Mr. Roberts was a diverter, and even that Mr. Roberts actually was a diverter, do not necessarily disprove that age was not a determining factor. If the evidence gave the jury reason to believe that Jaymar would have treated younger salesmen who sold to diverters differently than it treated Holzman, the jury could conclude that age was a determining factor in Holzman's firing. See *Brown*, 883 F.2d at 511.

■ Despite Jaymar's evidence, the jury could reasonably conclude that age was a determining factor in the decision to fire Holzman. Jaymar's witnesses testified that they first suspected Mr. Roberts of diverting because of the store's "unusual" buying pattern. But Holzman testified that Mr. Roberts' buying pattern was not unusual, and gave a reasonable explanation why it was not. Moreover, Holzman testified that in January 1985, Mr. Roberts had placed a large immediate order. Holzman telephoned and sent a memo to a Jaymar sales executive informing him of the large order and asking to be notified if there were any problems with the order. Nobody at Jaymar, however, ever questioned this order. If the jury believed this testimony (and it was entitled to believe it), the jury could infer that Jaymar did not really consider Mr. Roberts' buying pattern particularly unusual, and thus that Jaymar's stated grounds for suspecting and deciding to investigate Mr. Roberts were flimsy or even nonexistent.

Even so, a mistaken decision by itself does not violate the ADEA. But in the spring of 1986, Jaymar suspected several other salesmen of selling to diverters. The only such salesmen discussed at trial were younger than Holzman, ranging in age from their mid-thirties to late-forties. A January 10, 1986 company memo indicated that it was Jaymar's practice to inform salesmen selling to suspected diverters about the suspected diversion, and to include the salesmen in the investigation of the suspected diversion. The jury could infer that Jaymar told the younger salesmen about its suspicions and included them in subsequent investigations. The evidence

is clear, however, that Jaymar never told Holzman that it suspected Mr. Roberts of diverting until the April 22 meeting, which was after Jaymar had investigated Mr. Roberts.

In the past, we have held that this type of comparative evidence—evidence that a firm treated an older employee less favorably than similarly situated younger employees—raises an inference of age discrimination. See, e.g., *Brown*, 883 F.2d at 511; *Overgard v. Cambridge Book Co.*, 858 F.2d 371, 376 (7th Cir.1988). But Jaymar protests that any comparison between Holzman and the other salesmen in this case is meaningless because Holzman and the other salesmen were not similarly situated. Jaymar claims that while it arrived at its suspicion about Mr. Roberts without any help from Holzman, the only evidence about how it came to suspect any other diverters was testimony that one salesman tipped off Jaymar about an account he suspected was diverting.

It is true that there is no direct testimony about how Jaymar came to suspect any other possible diverter, other than the testimony about the salesman who tipped Jaymar off. But the January 10 memorandum itself states, "Those of you who have accounts in your territory that we've become suspicious of [as diverters], *we have notified* by telling you that we have marked our shipments of slacks...." (Emphasis added.) It is a plausible inference from this language that Jaymar informed these other salesmen of suspected diversion (with the one exception involving Holzman), not that these salesmen themselves brought the diversion to Jaymar's attention. Why would Jaymar have had to "notif[y]" salesmen of its suspicions if they already knew?

If the jury interpreted the January 10 memo as we have suggested (and we assume they did, since we must draw all reasonable inferences in Holzman's favor), the jury could conclude that Jaymar treated its younger salesmen differently (and more favorably) than Holzman when it came to investigating diversion. Jaymar told younger salesmen suspected of selling to diverters about the suspected diversion

and investigation, even though those salesmen had not reported the suspected diversion. Yet, Jaymar did not tell Holzman about its suspicions or investigation, and even used the fact that Holzman had not reported any suspected diversion as an excuse for not telling him what was going on.

Jaymar might assert, however, that Holzman claimed he was fired because of his age, and that the difference in investigations had nothing to do with Holzman's actual firing. Jaymar claims it had a strict policy: any salesman who sold to a diverter would be fired. There is no evidence to suggest that even if Jaymar had informed Holzman about its suspicions, the result of its investigation would have turned out differently. Moreover, there was no evidence to show that Jaymar had ever amassed the same amount of evidence against any other suspected diverter that it had against Mr. Roberts. These factors suggest the conclusion that even if Jaymar had treated Holzman the same as it had other salesmen suspected of selling to diverters, Jaymar still would have fired him.

This scenario, however, fails to take the evidence in the light most favorable to Holzman. The jury did not have to believe that Jaymar had a hard and fast rule that it would fire any salesman who sold to a diverter. Jaymar had never fired a salesman before for selling to a diverter even though its witnesses admitted they knew diversion was occurring, and diversion had been a sore spot with Jaymar for a long time. Moreover, Jaymar's witnesses testified that Jaymar had announced its "sell to a diverter and you're fired" policy at several sales meetings. Holzman, however, testified that he had attended those sales meetings, and had not heard anything about any such termination policy. Jaymar's Sales Manual, which set out Jaymar's policy concerning salesmen's conduct (for example, conflicts of interests), did not mention its purported policy of firing salesmen selling to diverters. In fact, the manual did not even mention diversion (at least before Holzman's firing). One might reasonably suspect that if Jaymar had a policy of firing salesmen selling to diverters, that policy would show up in the Sales Manual.

The manual's failure to include that policy, Holzman's testimony that he had never heard of any such policy, and the fact that Jaymar had never actually fired anybody for selling to a diverter, raise the inference that no such policy really existed.

Thus, the jury did not have to believe that Jaymar necessarily would have fired any salesman in the same position as Holzman. The fact that Jaymar's witnesses may have appeared less than truthful about at least two key factors that Jaymar said led to its investigation of Mr. Roberts and decision to fire Holzman—the allegedly unusual nature of Mr. Roberts' buying pattern and its purported policy of firing any salesman who sold to a diverter—raised the reasonable inference that Jaymar was trying to hide some factor in its decision to fire Holzman. See *Brown*, 883 F.2d at 510–11; *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 899 (3d Cir.1987) (en banc). The difference in the way Jaymar investigated Holzman and younger salesmen selling to suspected diverters raises the inference that age was that factor.

The inference that age was a determining factor in Jaymar's decision to fire Holzman is strengthened by Grasso's statement at the April 22 meeting that he would "give [Holzman] the opportunity of retiring because it would be a nice clean break for the company and for [Holzman]." One could interpret this remark as a benevolent gesture by Grasso, akin to offering an employee the face-saving option of resigning rather than being fired. But even if interpreted as a benevolent gesture, this remark could strengthen an inference of age discrimination. Jaymar wanted to make an "example" of a salesman who sold to a diverter. The salesman Jaymar chose as its "example" was Holzman, who was near retirement age. The jury could have concluded that Jaymar went after Holzman not so much because of a strong suspicion that Mr. Roberts was diverting (given Holzman's testimony that Mr. Roberts' buying pattern was not really unusual), but because Holzman presented a convenient target to use as its example. And, the jury could have concluded that Holzman

presented a convenient target because Holzman was near retirement age and the company could offer him the "benevolent" option of retiring—an option it could not offer to younger salesmen. The jury could also conclude Jaymar thought using Holzman as its "example" would hurt him less than using a younger salesman because Holzman was near the end of his employment anyway, and the black mark on his record would not affect him as much as it would a younger salesman.

Admittedly, Holzman's was not an overwhelming case. As is typical in age discrimination cases, there was no smoking gun. On the basis of the same evidence the jury could easily have found for Jaymar. But the evidence most favorable to Holzman was sufficient to raise an inference that Jaymar would not have fired Holzman had he been younger, and the jury was entitled to accept that inference. Therefore, we must affirm the jury's verdict that Jaymar violated the ADEA.[2]

## II.

Besides challenging the sufficiency of the evidence to support the jury's verdict, Jaymar also challenges two evidentiary rulings by the district court, and the propriety of the district court's instruction on what it meant for age to have been a "determining factor" in Jaymar's decision. All of these arguments are meritless.

## A.

■ Jaymar contends the district court erred by refusing to admit memoranda by regional sales manager Wallace describing his visits to the Mr. Roberts store. Jaymar, however, neglects to mention the district court's basis for excluding the memoranda. Moreover, Jaymar cites no authority to support admitting the memoranda. Since it is not this court's job to comb the record to determine the district court's basis for excluding the memoranda, or to

research the law to support Jaymar's argument, Jaymar has waived its argument concerning Wallace's memoranda. See *Reynolds v. East Dyer Development Co.*, 882 F.2d 1249, 1253 n. 2 (7th Cir.1989); *Beard v. Whitley County REMC*, 840 F.2d 405, 408–09 (7th Cir.1988).

■ Jaymar also challenges the district court's decision to admit a chart Holzman introduced at trial as part of an attempt to show that Jaymar had engaged in a pattern of age discrimination of which his firing was a part. The chart purported to show the change in Jaymar's sales force between June 1, 1985 and June 1, 1986. The first part of the chart, entitled "Terminees Between 6/1/85 and 6/1/86" listed the names, ages, length of employment, and last day of service with Jaymar (which the chart referred to as "Date of Termination") of the nine Jaymar employees (including Holzman) who left Jaymar between June 1, 1985 and June 1, 1986. The chart showed that of the nine employees who left Jaymar, five were at least age 64 and older, and six were at least age 59. The second part of the chart, entitled "Comparison of Workforce, 6/1/85 and 6/1/86," broke the sales force down into five groups based on age: 20–29; 30–39; 40–49; 50–59; and 60–69. The chart showed the number of employees in each age group and the percentage of the total sales force each group represented on June 1, 1985 and June 1, 1986. The chart showed that on June 1, 1985, Jaymar employed 11 salesmen between 60 and 69 years old, which represented 17.7% of the total sales force; by June 1, 1986, the number of salesmen between ages 60 and 69 declined to 6, and the percentage of the total sales force to 9.4%.

Jaymar generally contends the district court erred by admitting the chart into evidence because the chart was not probative of age discrimination. Specifically, Jaymar first asserts the June 1, 1985 date from which the chart measured the

---

**2.** In *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the Supreme Court held that in certain discrimination cases the employer bears the burden of proving that it would have reached the same decision

absent any discrimination. Because we find that Holzman carried his burden of proving that age discrimination was a determining factor in his firing, we need not decide whether *Price Waterhouse* applies in this case.

changes in Jaymar's sales force was arbitrary. Jaymar, however, does not state why June 1, 1985 was not a proper point from which to measure the changes in the sales force, and cites no authority to support this argument. Thus, we will not reverse on this ground. Jaymar next complains that the chart "simply reflected the normal course of [Jaymar's] employment history" and was not prepared or introduced by a statistical expert who could have testified about whether the numbers in the chart—particularly, the decline in the sales force aged 60 to 69—were statistically significant.[3] Jaymar, however, did not raise this objection in the district court, so it has waived the objection on appeal. See *Reynolds*, 882 F.2d at 1253 n. 2. In any event, Jaymar was free to introduce evidence to show the defects in the chart, and to argue to the jury that the chart was not probative.

Jaymar finally argues that the chart was misleading because it used the term "terminations" to refer to all departures from Jaymar, whether voluntary or involuntary. But Holzman's foundation witness testified that "date of termination" (a term taken from Jaymar's own interrogatory answers) referred only to an employee's last day of employment, not to whether the employee left Jaymar voluntarily or involuntarily. Jaymar's attorney also cross-examined Holzman's foundation witness on this point and reiterated during closing argument the limited meaning of "termination" as used on the chart. If Jaymar was concerned that the jury might infer all the terminations on the chart were involuntary (a possibility we think slight given the witness's testimony and Jaymar's attorney's argument), it could have introduced evidence to show they were not. The district court did not abuse its discretion in admitting the chart over the objection that it was misleading.

## B.

■ Jaymar also contends the district court erred by refusing to instruct the jury

that it could find for Holzman only if it found that Jaymar would not have fired him "but for" his age. The district court instructed the jury that Holzman had to prove age was a "determining factor" in his discharge. The court went on to explain that

It is not enough that age discrimination be present or even that it figured in the decision to fire plaintiff.... In order to find that age was a "determining factor" you must find that age made a difference *in the sense that plaintiff would not have been discharged had he been younger.*

(Emphasis added.) This instruction correctly described the causation Holzman had to prove. True, our cases have generally described the relevant causation standard in ADEA cases as "but for" causation. See, e.g., *Brown*, 883 F.2d at 507; *Grohs v. Gold Bond Building Products*, 859 F.2d 1283, 1285 (7th Cir.1988); see also *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 1797, 104 L.Ed.2d 268 (O'Connor, J., concurring in the judgment), 109 S.Ct. at 1806–07 (Kennedy, J., dissenting). But all it means for something (for example, a person's age) to be a "but for" cause of an event is that the event would not have occurred without that thing. See *Price Waterhouse*, 109 S.Ct. at 1087 (Kennedy, J., dissenting); see also W. Keeton, D. Dobbs, R. Keeton, and D. Owen, *Prosser and Keeton on the Law of Torts* § 41, at 265–66 (5th ed. 1984). To say that Jaymar would not have fired Holzman "but for" his age, then, is to say that Jaymar would not have fired Holzman had he been younger, which is precisely what the causation instruction told the jury was the proper standard. Jaymar's argument that the district court should have used the words "but for" in its causation instruction is nothing more than a semantic quibble.

## III.

■ In his cross-appeal, Holzman contends the district court erred by granting

---

3. An attorney in the firm representing Holzman prepared and supplied the foundation to admit the chart.

JNOV for Jaymar on the question of whether Jaymar's ADEA violation was willful. An ADEA violation is willful "only if, when the defendant acted, the defendant 'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA.'" *Brown,* 883 F.2d at 512; see also *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 126, 105 S.Ct. 613, 624, 83 L.Ed.2d 523 (1985). The Supreme Court in *Thurston* specifically rejected the notion that an employer's ADEA violation is willful if the employer merely knows the ADEA exists or is "in the picture." See *id.* at 127–28, 105 S.Ct. at 624–25; *Overgard v. Cambridge Book Co.,* 858 F.2d at 377.

■ We agree with the district court that Holzman's evidence showed, at most, that Jaymar had knowledge the ADEA was somewhere "in the picture" and thus that Holzman did not prove Jaymar's ADEA violation was willful. The only evidence regarding Jaymar's knowledge of the ADEA was Levitin's affirmative answer to a general question about whether "the laws of the United States" required Jaymar to "employ anyone regardless of race, color, religion or sex or age." There was no evidence at all concerning the knowledge of any Jaymar executive or supervisor concerning the ADEA or its specific requirements. In short, Levitin's general statement was not sufficient to show that Jaymar acted with knowledge of or in reckless disregard of the ADEA's prohibitions.

For the reasons stated above, we affirm the district court's judgment.

AFFIRMED.