Wortham M. McCULLOUGH, Robert McCullough, and Gerald A. Gore, Plaintiffs,

v.

CONSOLIDATED RAIL CORPORATION, Defendant.

No. 90 C 1226.

United States District Court, N.D. Illinois, E.D.

Oct. 30, 1991.

Kenneth Alan Henry, Chicago, Ill., Sidney J. Suo, Suo, Rundell and Hechtman, Troy, Mich., for plaintiffs.

Dana Shelton Connell, Kathryn A. Mrkonich, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendant.

## ORDER

NORGLE, District Judge.

Defendant Consolidated Rail Corporation ("Conrail") has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). For the reasons that follow, the court grants the motion in part, and denies it in part.

## FACTS

This case involves the alleged discriminatory promotion practices of the railroad company-defendant Conrail. To fully understand the basis for summary judgment and the court's decision, an in-depth description of the facts of this case is necessary.

Conrail had established a hierarchy of command in its Chicago Division. The head of operations in the division was the Chicago Division Official, in this case Michael Love. Second in command was the Division Superintendent, Edward Stefano-

vich.[1] Below him was the Day Terminal Supervisor, Warren Stapelton. Another rung down were Train Masters who worked in the various train yards around the Chicago Division. Below them were the Yard Masters who were responsible for the switching of railcars in the yards. Finally, the lowest position relevant to this dispute is that of Trainman, which title encompasses a number of jobs including that of Brakeman. Wortham McCullough ("Wortham"), Robert McCullough ("Robert"), and Gerald A. Gore ("Gerald") (or collectively "plaintiffs") were all Brakemen for Conrail; they are also black.

Advancement at Conrail was a complicated procedure. When a job such as Yard Master became available, it would be "posted" on what the parties term a "clipboard" or "bulletin board." This was presumably a conspicuously placed board or wall in each Conrail yard upon which was posted a piece of paper listing the grade or level of the job, experience and training requirements, and the salary. According to company procedure, anyone interested in filling the posted position would complete a "CT–88 Application for Position" form. The applicant was required to take the carbon copies from the perforated form and submit one to the Labor Relations Department and one to the local Union Chairman.

Pursuant to an agreement between the Railroad Yard Masters of America and Conrail, certain employees were given Seniority in application for a Yard Master's position.[2] If no one was designated as Senior, the clerk would collect the applications and then refer the names of the various applicants to the Day Terminal Supervisor who would then select the person to fill the vacancy.

However, the procedure was not always strictly followed. Warren Stapelton said at his deposition that he would consider someone for a Yard Master job without a CT–88 form when the employee was referred to him by that employee's supervisor. Mr. Stefanovich said at his deposition that if someone didn't obtain the appointment he sought, that worker would be considered for the next position without re-applying, at least if the second opening developed shortly after the first application. Finally, Terminal Superintendent Thomas Flannigan stated in an affidavit that the Conrail policy was, in practice, to have the Terminal Superintendent appoint the new Yard Master and that person would assume the job duties until the appointment was approved by the Conrail hierarchy.

Plaintiffs attempted to apply for several Yard Master jobs during the course of their employment at Conrail.[3] Specifically, there are nine[4] posted openings at the 55th Street Conrail yard in 1983 through 1984. The first two were posted on September 21, 1983. Although the appointment was normally to be performed by the Day Terminal Supervisor, no one was filling that job at the time since Warren Stapelton had not yet assumed his duties. Therefore, Train Master Michael Chewar filled the jobs, giving one to a person with Seniority and the other to Marty Eglar, a white male.

The third job was posted on October 19, 1983. Again, Train Master Chewar filled this job, giving it to R.L. Perry, whose race is not in the record. However, Perry held that job for only a short period, being forced out when Perry's superior was demoted into Perry's newly-acquired job. Consequently, when the fourth job was

---

**1.** Defendants spell his surname "Stephanovich."

**2.** For example, if two employees applied for a Yard Master position and one had been designated Senior under the RYA agreement, the Senior would get the position automatically without considering the qualifications of the other employee. Neither party objects to this arrangement.

**3.** Plaintiffs do not refer to any type of job from which they were excluded except that of Yard Master. Therefore, all references to openings

or jobs are to Yard Master positions unless otherwise indicated.

**4.** Defendants do not mention the November 2, 1983, job and only 2 of the 4 February 8, 1984, jobs mentioned by the plaintiffs. The court assumes all nine to be at issue here. However, since the discrepancy arises in jobs that were filled by those with Seniority, it will be shown that summary judgment as to those dates is proper and will be granted for the reasons stated below.

posted on November 2, 1983, Perry had Seniority and was given that job.

Jobs five through eight were posted on February 8, 1984. By this time, Warren Stapelton had assumed his duties and assigned two of the jobs to Thomas Morgan and P.C. Litto,[5] although the race of these two employees is not in the record. The other two openings were filled by employees with Seniority. The final job of contention is the March 7, 1984 opening filled by T.P. Kienzle, a white male. Kienzle was selected by Train Master Crawford while Stapelton was on sick leave.

The method in which each plaintiff applied for these jobs is a subject of much controversy. The first job Robert applied for was the November 2, 1983 job filled by R.L. Perry, job four. It is undisputed that his application did not comply with official company procedure. Rather, Robert completed the CT–88 form and made two photocopies. He then submitted one to the Manager of Labor Relations via the company mail and hand delivered the second to Terminal Supervisor Flannigan, who gave it to a Division Superintendent. Robert contends he applied for the job openings subsequent to November 2, 1983. He maintains that since he did not receive the November 2 job, he applied for all subsequent jobs by way of the un-official company policy of rolling over applications of those who did not receive the appointment for which they first applied. Robert presents no evidence he applied for any Yard Master promotion prior to November, 1983.

Wortham followed a similar procedure. The first jobs he specifically applied for were the February 8, 1984 openings, jobs five through eight. Instead of following the company policy, Wortham completed the CT–88 form, photocopied it, placed it in a manila envelope, and then placed that in the company mail addressed to the Superintendent of Labor Relations. Wortham contends he applied for the March, 1984 job since he applied for and did not receive the February jobs for which he applied. Wortham does not present any evidence that he

applied for any Yard Master promotion prior to February, 1984.

With regard to Gerald, both sides apparently agree that he applied for all posted jobs, although there is no other evidence to this effect. It is also agreed that none of the plaintiffs ever received a promotion to any of these nine jobs.

Sometime thereafter, plaintiffs filed suit alleging they were the victims of discrimination and pursuant to Title VII (42 U.S.C. § 2000e *et seq.*) and are entitled to relief. Specifically, each alleges he was passed up for various promotions solely because of his race. Each alleges a disparate treatment case. Conrail has now moved for summary judgment alleging that plaintiffs did not comply with application procedures, were not qualified for the jobs they sought, and in any case, plaintiffs have a burden to make out a prima facie case of discrimination that they have not satisfied.

## DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A plaintiff cannot rest on mere allegations of a claim without any significant probative evidence which support his complaint. *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims and defenses...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–4, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Accordingly, the non-moving party is required to

**5.** Plaintiffs report the name as T.C. Litto.

go beyond the pleadings, affidavits, depositions, answers to interrogatories and admissions on file to designate specific facts showing a genuine issue for trial. *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991).

The use of summary judgment in Title VII cases is proper. *United Ass'n of Black Landscapers v. City of Milwaukee,* 916 F.2d 1261, 1264 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991). When a party is unable to make a sufficient showing on an essential element of a case for which that party bears the burden of proof, summary judgment is proper. *Common v. Williams,* 859 F.2d 467, 469 (7th Cir.1988).

■ The burdens on each party are well established. In the first instance the plaintiff bears the burden of proving by the preponderance of the evidence a prima facie case of discrimination. *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 986–87, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988) (O'Connor, J., with three Justices concurring). The prima facie case of racial discrimination consists of four elements: (1) that plaintiff belongs to a racial minority; (2) that plaintiff applied for an available position; (3) that despite being qualified for the job, the plaintiff was rejected; and (4) that position was filled by another applicant. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *McCalpine v. Foertsch,* 870 F.2d 409, 414 (7th Cir.1989). To establish a prima facie case of disparate treatment under Title VII, a plaintiff may offer either direct evidence of intentional discrimination or evidence of a combination of factors from which a discriminatory animus may be inferred. *Gilty v. Village of Oak Park,* 919 F.2d 1247, 1250 (7th Cir. 1990). After plaintiff provides sufficient evidence to meet his or her prima facie case, "the employer must produce 'evidence that plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.'" *Cooper v. Federal Reserve Bank,* 467 U.S. 867, 875, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984) (quoting *Texas Dept. of Community Affairs v.*

*Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)); *see also Johnson v. Transportation Agency, Santa Clara County,* 480 U.S. 616, 626, 107 S.Ct. 1442, 1449, 94 L.Ed.2d 615 (1987) (affirmative action plan is one such nondiscriminatory basis).

■ After defendant meets that burden, discrimination is no longer presumed. *Cooper,* 467 U.S. at 875, 104 S.Ct. at 2799. The plaintiff must then prove by a preponderance of the evidence that the supposedly legitimate reasons offered for the decision were actually a pretext for discrimination. *Watson,* 487 U.S. at 986, 108 S.Ct. at 2784 (O'Connor, J., with three Justices concurring); *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093 (ultimate burden remains on plaintiff); *Namenwirth v. Board of Regents,* 769 F.2d 1235, 1240 (7th Cir.1985).

■ In a disparate treatment case such as this, the final analysis turns on a demonstration of the employer's subjective intent to discriminate. *See Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 2119, 104 L.Ed.2d 733 (1989). "Of course, if this issue requires weighing the credibility of witnesses or the facts in question, summary judgment is inappropriate." *United Ass'n of Black Landscapers,* 916 F.2d at 1265–66.

### A. Contested Positions

Plaintiffs have failed to meet their burden with regard to several of the positions they put at issue. None of the parties here object to the agreement between the Railroad Yard Masters of America and Conrail. Nor does any party complain that the effect of this agreement on promotion practices at Conrail is racially based. In fact, all parties agree that if an employee was designated as Senior, that employee would get the posted position before non-senior employees. It is further agreed that none of the plaintiffs had Seniority at the time of their applications.

Four jobs were given to Senior employees at times relevant to this litigation: one September 12, 1983 job; the November 12, 1983 position; and two of four posted Feb-

ruary 8, 1984. By agreeing with Conrail that the practice was proper, plaintiffs have removed these positions from dispute.

### B. Jobs for Which Each Plaintiff Applied

As previously discussed, the second element of plaintiffs' prima facie case is that the plaintiff *applied for* an available position. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824 (emphasis added). Thus, the court must determine for which positions each plaintiff applied.

### 1. Robert McCullough Application

Robert first applied for the position posted on November 2, 1983 which was filled by R.L. Perry. But Perry had originally been given the position posted on October 19, when Perry was forced out because his supervisor was demoted. Perry's stint as Yard Master gave him Seniority according to the Railroad Yard Master's agreement, and consequently the November 2 job was given to Perry. Robert cannot now object to the giving of jobs to those Senior to himself. Therefore, the fact that the Senior Perry received the November 2 position ahead of Robert is of no consequence here.

Nonetheless, Robert insists he applied for all jobs subsequent to this date by way of his failure to attain the November 2 job. He relies on the informal company policy of rolling over application of those who failed to receive the position for which they applied. This court assumes, without deciding, that Robert properly applied for two of the jobs posted on February 8, 1984 and one on March 7, 1984. The other positions are not at issue in Robert's case since he has failed to demonstrate he even attempted to apply for them.

### 2. Wortham McCullough Application

The first position for which Wortham applied was posted on February 8, 1984. Like Robert, Wortham's failure to apply for the posted openings prior to this date foreclose his ability to seek damages under Title VII for his failure to be promoted to those positions. Also like Robert, Wort-

ham insists he applied for the March 7, 1984 job since he did not receive any of the February 8 positions. This court again assumes, without deciding, that Wortham properly applied for two of the jobs posted on February 8, 1984 and one on March 7, 1984. The other positions are not at issue regarding Wortham since has failed to show even an attempt to apply for those jobs.

### 3. Gerald Gore Application

Apparently both parties agree that Gore applied for every position at issue in this matter. This court again assumes, without deciding, that Gerald has properly applied for the five positions open to him in this case.

### C. The Remaining Positions

As the foregoing discussion reveals, the court has substantially trimmed the number of jobs at issue. Now the court must consider whether the applications of Robert and Wortham were so deficient as to entitle Conrail to summary judgment.[6]

■ When Robert applied for the November 2, 1983 job, he actually filled out a CT–88 application. Instead of detaching the perforated forms, however, he delivered photocopies. Instead of giving them to the Labor Relations Department and the Union Chairman, he used company mail to deliver a copy to the manager of Labor Relations and one to the Terminal Supervisor. Robert did not fill out applications for the subsequent job openings.

Wortham followed a similar procedure. He filled out a CT–88, photocopied it, and sent that copy via company mail to the Superintendent of Labor Relations. He also failed to fill out applications for the later-posted jobs.

In a technical sense, both have failed to comply with the strictures of Conrail policy. However, at least with regard to their initial applications, both have in substance fulfilled the requirements of application. The purpose of application is to let the

---

**6.** Conrail concedes Gerald fully complied with all application procedures. He will not, there-
fore, be discussed in this portion of the opinion.

employer know the employee wants to be considered for a position. This, Robert and Wortham have done. They filled out the proper form. But instead of delivering the perforated carbon copies, they delivered photocopies. Defendants have not alleged any special quality of the carbon form that mandates their use. Nor was delivery via company mail inadequate. Many important documents travel this route. Although technically inadequate, the applications were well within their requisite purpose, to inform Conrail that Robert and Wortham McCullough wanted to be considered for these openings. There is, therefore, a genuine issue of material fact on this issue.

■ Conrail, however, contends that even if plaintiffs properly applied for the original openings, they have not applied for subsequent openings. It is true that neither Robert nor Wortham filled out CT–88's again for each newly-posted job. But plaintiffs produced evidence from various employees at Conrail that the application process was somewhat looser than the book required. It was stated that applicants would normally be considered for subsequent positions if they failed to obtain the prior promotion. There is a question of fact as to whether Robert and Wortham complied in a manner sufficient to be considered for promotion under Conrail's actual policy in practice. Consequently, summary judgment is improper on this basis as well.

■ The parties have raised other issues that merit brief discussion. Conrail contends that none of the plaintiffs were the best qualified for the jobs for which they applied. Therefore, so runs the argument, plaintiffs have failed to satisfy the third element of their prima facie case. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824.

Conrail misinterprets the meaning of the word "qualified" in this context. When referring to plaintiffs' initial burden of proof, qualified is more akin to eligible or competent, not the most skilled, capable, or competent. For example, a 31 year-old applicant would not be qualified for position where the maximum allowable age for an

applicant was 29. *Kofer v. Pelham,* 710 F.Supp. 483, 484 (S.D.N.Y.1989). An applicant's failure to possess required aptitude, intellect, and communication skills can legally render an employee unqualified if the measuring tool is a fair one. *Hill v. Seaboard Coast Line R.R. Co.,* 885 F.2d 804, 808–10 (11th Cir.1989). The fact that others might be better skilled, have better work records, and the like go to Conrail's potentially non-discriminatory reason for failing to promote each plaintiff. And, whether that is true is inherently a question of fact. *Maldonado v. Metra,* 743 F.Supp. 563, 569 (N.D.Ill.1990).

■ All parties make much of the allegedly racist statements made by Division Superintendent Stefanovich. However, the Division Superintendent had no direct involvement in the promotion process and was not plaintiffs' immediate supervisor. Thus, the statements of Stefanovich are not relevant here. *See Bailey v. Northern Indiana Pub. Serv. Co.,* 910 F.2d 406, 410 (7th Cir.1990) (racial animus by immediate supervisor is one method to meet prima facie case). An opposite conclusion might follow if it could be shown that Stefanovich inflicted his racist motives on his subordinates. *Village of Bellwood v. Dwivedi,* 895 F.2d 1521, 1530 (7th Cir.1990). There is no evidence in the record to support such a conclusion.

## CONCLUSION

The winnowing process has left the court with only a few positions that survive summary judgment. Robert has pursued Title VII claims for all nine job postings. This court grants summary judgment on one of the September 21, 1983 jobs, the November 2, 1983 position, and two of the four February 8, 1984 jobs. In each of these cases, the job was given to someone with Seniority and therefore not a position available to Robert. Summary judgment is granted for the second September 21, 1983 and October 19, 1983 postings since Robert did not apply for those jobs. That leaves only three job postings still open for which Robert may continue his Title VII claims against Conrail: two of the four February 8, 1984 openings, and the position posted March 7, 1984.

Wortham has also pursued Title VII claims for all nine openings. This court grants summary judgment on one of the September 21, 1983 jobs, the November 2, 1983 position, and two of the four February 8, 1984 jobs. Each of these was given to an employee with Seniority and therefore not open to Wortham. Summary judgment is also granted for the other September 21, 1983 position, and the October 19, 1983 job opening. Wortham did not apply for either of these and therefore he may not now be heard to complain that he was not promoted to those positions. The effect of summary judgment leaves only three job openings in dispute for Wortham: two of the February 8, 1984 jobs, and the March 7, 1984 opening.

Finally, Gerald has also alleged Title VII violations for all nine positions. Summary judgment is granted as to one of the September 21, 1983 jobs, the November 2, 1983 position, and two of the four February 8, 1984 jobs. These jobs were given to Senior employees and thus not open to Gerald. That leaves Gerald able to contest the following openings: one of the two September 21, 1983 jobs, the October 19, 1983 position, two of the four February 8, 1984 openings, and the March 7, 1984 position.

IT IS SO ORDERED.